[No. S004761. Crim. No. 26221. May 2, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LAVELL FRIERSON, Defendant and Appellant.

COUNSEL

Fern M. Laetham, State Public Defender, under appointment by the Supreme Court, Adrian K. Panton and Sandra L. Goldsmith, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Mark Alan Hart, Susanne C. Wylie, Noreen F. Berra, Susan L. Frierson and Richard L. Walker, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—This case, arising out of the 1977 death penalty law, is before us for the third time. In *People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587] (*Frierson I*), we reversed defendant's conviction of first degree murder with special circumstances and other offenses, together with a verdict of death, because of ineffective assistance of counsel for failing to investigate or present a diminished capacity defense.

Defendant was retried, convicted of the same offenses with the same special circumstances, and again sentenced to death.

In *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396] (*Frierson II*), we affirmed convictions of first degree murder (Pen. Code, § 187),[1] two counts of robbery (§ 211), two counts of kidnapping for purposes of robbery (§ 209), and assault with a deadly weapon (§ 245, subd. (a)), with firearm-use and great-bodily-injury enhancement allegations (§§ 12022.5, 1203.06, subd. (a)(1), 12022.7). We reversed special circumstance findings under the 1977 death penalty law for murder during the course of a robbery and a kidnapping (former § 190.2, subd. (c)(3)(i), (ii)), and the death sentence, because defense counsel elected not to present a diminished capacity defense at the guilt phase despite defendant's wish that such a defense be presented.

At the third trial, the jury again found the special circumstances true, and again imposed the death penalty. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd.(e)), and entered a judgment of death. This appeal, like the previous two, is automatic. (§ 1239.) This time, we affirm.

## I. Facts

### A. *Guilt Phase*

The jury convicted defendant of kidnapping and robbing Edgardo Kramer and Guillermo Bulnes, of murdering Kramer execution style, and of shooting Bulnes in the back of the head.

### 1. *Prosecution Evidence*

The prosecution case-in-chief at the third trial revealed essentially the same facts as the first two trials. We review them briefly.

On January 3, 1978, Kramer and Bulnes, two Peruvian airline employees, drove to the Holly Aire Motel in Inglewood to visit a woman named Chris. Bulnes knocked on the door to room 18 and told the young woman who responded—later identified as Zondre Wooley—that he was looking for Chris. Wooley said she was not there, offered to call her for him, and walked to a nearby telephone booth. Wooley later said that Chris would arrive shortly. Bulnes and Kramer then sat in Bulnes's car parked across the street from the motel.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Soon thereafter, defendant approached the car and asked if they were waiting for Chris. When Bulnes said that they were, defendant drew a gun and pointed it at Bulnes. He entered the backseat behind the two men, and ordered Bulnes to lock the door, close the windows, start the car and begin driving.

During the ride, defendant demanded and obtained property from both victims. Although defendant told Bulnes to watch the road and not look back, Bulnes turned and glanced at defendant's face several times. After traveling a few blocks at defendant's direction, defendant ordered Bulnes to park the car. He then shot both Bulnes and Kramer in the backs of their heads. Kramer was killed. The bullet directed at Bulnes hit him above the ear but did not penetrate his skull. He was able to grapple with defendant and disarm him. Bulnes pointed the gun at defendant and left the car.

After running a few steps, Bulnes fell to the ground. Defendant grabbed him around the neck and tried to retrieve the weapon. During the ensuing struggle, Bulnes emptied the gun's chamber by firing shots into the ground and threw the gun away. When defendant released his grip, Bulnes ran to a nearby street, flagged down a passing motorist, and was driven to a hospital.

At the retrial, Bulnes gave the foregoing account of the incident and positively identified defendant as the assailant. He had observed nothing suggesting defendant was intoxicated. The investigating police officers testified that defendant and Wooley were arrested a few hours after the crimes in room 18 at the Holly Aire Motel. Distinctive watches owned by the victims, defendant's bloody clothing, and other incriminating evidence were found in the motel room. An inmate who had been at the county jail when defendant was initially apprehended testified that defendant had recounted the entire crime to him, admitting that he had robbed and shot the two victims.

## 2. *Defense Evidence*

Defendant primarily presented a diminished capacity defense. Testimony of his mother, several friends and Wooley suggested that at the time of the crimes, defendant's mental state was affected by his use of phencyclidine (PCP) and possibly other drugs and beer. Dr. Marvin Gillick, a forensic psychiatrist, examined defendant and reviewed selected materials supplied by the defense. He opined that at the time of the crime, defendant was able to form the specific intent to commit robbery and to harbor malice but, due to mental impairment caused by the ingestion of PCP, was unable to "form the specific intent to commit first degree murder, that means deliberate, premeditate and maturely and meaningfully reflect." Carl Trout, a

"narcotics consultant," testified that it is not easy to determine if a person is under the influence of PCP.

## B. Penalty Phase

### 1. Prosecution Evidence

On May 20, 1972, Douglas Green was killed in Los Angeles by a bullet wound in the chest. Detective Sergeant Thomas Miller arrested defendant, Michael Concepcion and Lewis White for the homicide. All 3 were 15 or 16 years old. Detective Miller placed the three in an interview room, and went to another room where he could overhear conversation among them. He heard defendant say, " 'I thought he had a cake cutter in his pocket and I pulled it out and it was a gun.' " Defendant said that he had "clicked the gun a couple of times and the gun went off, shooting the deceased"; and something to the effect, " 'I wonder if it would be self-defense if I had shot this dude with his own gun.' " There was some laughter followed by defendant imitating "the noises that the deceased made after he was shot in trying to breathe." Defendant said something like, " 'Did you hear the dude when I shot him? Did you hear him?' "

Documentary evidence established that the juvenile court sustained a petition alleging that defendant had murdered Green. The court committed defendant to the California Youth Authority.

The prosecution also presented evidence showing that defendant committed one armed robbery on December 21, 1977, and a second robbery involving three victims on December 24, 1977.

### 2. Defense Evidence

A correctional officer at San Quentin testified that defendant had been "better than a model prisoner" while on death row. A neighbor testified that defendant had been a "good boy." Defendant's parents and sister testified about his drug usage and violent tendencies while on drugs.

Philip McCain testified that he was at the party at which Green was shot and killed. McCain testified that Louis White shot Green; afterwards White said that he "did it." Michael Concepcion testified that he was present at the shooting. He did not see who did it, but defendant was not there. Concepcion further testified that White was present and possessed a gun. White refused to testify on self-incrimination grounds.

Defendant admitted the two December 1977 robberies, but denied shooting Green. He testified about his drug problems. He said he was "very sorry" about what had happened.

## II. DISCUSSION

### A. *Issues Relating to Counsel*

Defendant contends the court erred in denying him cocounsel status, not granting him substitute counsel, and denying his eve-of-trial motion to represent himself.

#### 1. *The Facts*

Following the second reversal of this case, the trial court appointed Arnold Lieman to represent defendant on November 18, 1985. On January 14, 1986, through counsel, defendant requested that he be allowed to act as cocounsel because "he is intimately involved in the proceedings, and as cocounsel . . . he would have access to the law library and the privileges in regard to being able to perhaps help in researching the law." The court denied the request.

On June 5, 1986, trial was set for September 29. On September 26, the court trailed the case until October 1. However, on September 29, defendant expressed dissatisfaction with his attorney and asked to represent himself. On that day and the next, the court held a *"Marsden"* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) outside the presence of the prosecution. Defendant complained about his attorney and investigator, and they responded. The court found that defense counsel was acting competently and diligently on defendant's behalf, and found no "good cause to relieve the attorney."

Defendant's self-representation was thereafter discussed in the presence of the district attorney. Defendant asked to take the case off calendar and for a 60-day continuance so he could prepare for trial. The court found no need to continue the trial, and denied the motion for self-representation since defendant was not ready to proceed in propria persona. The defense was granted a continuance until October 14 to allow counsel "to reestablish communications with Mr. Frierson and to insure that he would cooperate fully in the trial of his case."

#### 2. *Discussion*

In considering defendant's contentions regarding his representation, we, like the dissenters in *Frierson II*, have an "uneasy feeling of *déjà vu*." (39 Cal.3d at p. 818 (dis. opn. of Mosk, J.).) At his first trial, the jury convicted

defendant on all counts and imposed the death penalty. We reversed because defense counsel failed to reasonably investigate a diminished capacity defense. New counsel was provided defendant (*Frierson II, supra,* 39 Cal.3d at p. 809); counsel investigated the defense and presented it as he tactically thought best. The jury again convicted on all counts and again imposed the death penalty. We reversed again, this time because defendant had desired that the diminished capacity defense be presented differently. Yet another defense counsel was provided to defendant, who presented a vigorous, if ultimately unpersuasive, defense in the manner defendant wanted. The result was again the same. Now defendant asks for a third reversal because of alleged errors relating to counsel. This time, however, as all contentions lack merit, the journey ends.

■ Defendant first contends the court erred in denying him cocounsel status. A defendant represented by counsel, however, has no right to cocounsel status. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698].) Allowing a represented defendant to share legal functions with the attorney is generally undesirable. The court's discretion to authorize such an arrangement is therefore "sharply limited," and may be exercised only upon a "substantial" showing that it will promote justice and judicial efficiency in the particular case. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) As no such showing was made here, the court acted well within its discretion in denying cocounsel status.

■ Next, relying on *Marsden, supra,* 2 Cal.3d 118, defendant contends the court erred in not granting him yet another appointed counsel. As the Attorney General correctly points out, defendant never requested different counsel. Instead, he sought self-representation. His expressions of dissatisfaction with his attorney as a reason for this decision are insufficient to require the court to inquire whether he wanted substitute counsel. (*People* v. *Burton* (1989) 48 Cal.3d 843, 855 [258 Cal.Rptr. 184, 771 P.2d 1270].)

In addition, the court held what it termed a *"Marsden"* hearing. It "patiently listened to defendant's complaints about counsel, [and] asked counsel for his side of the story. . . ." (*People* v. *Wright* (1990) 52 Cal.3d 367, 410 [276 Cal.Rptr. 731, 802 P.2d 221], fn. omitted.) The court "probed further by asking defendant to be more specific [and] by inquiring into general areas of dissatisfaction." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 77 [241 Cal.Rptr. 594, 744 P.2d 1127].) At the conclusion, it reasonably found counsel was acting competently and diligently on defendant's behalf. "Defendant thus failed to show his right to counsel would be 'substantially impaired' by proceeding to trial with his appointed counsel." (*People* v. *Burton, supra,* 48 Cal.3d at p. 856, quoting *People* v. *Marsden, supra,* 2 Cal.3d at p. 123.) There was no *Marsden* error.

■ Defendant finally contends the court erred in denying his motion to represent himself. Although a defendant has a federal constitutional right to represent himself (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]), in order to invoke an unconditional right he must assert it " 'within a reasonable time prior to the commencement of trial.' " (*People* v. *Burton, supra*, 48 Cal.3d at p. 852, quoting *People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) A motion made after this period is addressed to the sound discretion of the trial court. (*Ibid.*) The court should consider such factors as the " 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*Burton, supra*, at p. 853, quoting *Windham, supra*, at p. 128.)

Defendant's *Faretta* motion on the eve of trial over 10 months after counsel had been appointed was not made within a " 'reasonable time prior to the commencement of trial.' " (*Burton, supra*, 48 Cal.3d at p. 852.) The court thoroughly investigated the quality of counsel's representation, the reasons for the request, and the expected delay. Its denial of the motion was within its discretion. (*Id.* at p. 854 [motion for self-representation made on day matter sent to trial department for trial properly denied].)[2]

B. *Jury Selection Issue*

■ Defendant contends the court erred in excusing for cause one prospective juror because of his opposition to the death penalty. A prospective juror may be excused for cause if that juror's views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].)

The record supports the exclusion of the juror in question. The court asked if he would "refuse to vote for death regardless of the evidence." He responded, "I think so." Where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to the juror's true state of mind is binding on an appellate court. (*People* v. *Ghent, supra*, 43 Cal.3d at p. 768; see also *People* v. *Guzman* (1988) 45 Cal.3d 915, 956 [248 Cal.Rptr. 467, 755 P.2d

---

[2] We have previously rejected defendant's argument that we should adopt a slightly different federal rule regarding timeliness of a motion for self-representation. (48 Cal.3d at pp. 853-854.)

917] [use of words like "I think" to qualify answers does not undermine a finding of substantial impairment].) We find no error.

## C. *Witness Invoking the Right Against Self-incrimination*

■ ■ At the penalty phase, the defense claimed that Louis White, rather than defendant, murdered Green. Defendant called White as a witness. Outside the jury's presence, White asserted the privilege against self-incrimination as to questions regarding the shooting. The court denied defense counsel's request that White assert the privilege in front of the jury. Nevertheless, defense counsel called White in front of the jury. White answered questions about his age and name, then asserted the privilege when asked if he was at the party at which Green was killed. At a bench conference, the court reminded counsel that it had already ruled the witness could not assert the privilege in front of the jury. Defense counsel then asked White about a prior felony conviction, and his testimony in front of the jury ended.

Ignoring the fact that, despite the court's ruling, defense counsel succeeded in causing White to assert the privilege in front of the jury, defendant now contends the court's ruling was error. It was not. No inference may properly be drawn from the invocation of a privilege. (Evid. Code, § 913, subd. (a).) Allowing a witness to be put on the stand to have the witness exercise the privilege before the jury would only invite the jury to make an improper inference. (*People v. Johnson* (1974) 39 Cal.App.3d 749, 760 [114 Cal.Rptr. 545]; *Bowles v. United States* (1970) 439 F.2d 536, 541-542 [142 App.D.C. 26].) Therefore, "it is the better practice for the court to require the exercise of the privilege out of the presence of the jury." (*People v. Johnson, supra*, 39 Cal.App.3d at p. 759.) We have "commend[ed]" the approach "as a means by which to avoid the potentially prejudicial impact of the witness asserting the privilege before the jury." (*People v. Ford* (1988) 45 Cal.3d 431, 441, fn. 6 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785].)

Citing *People v. Pugh* (1983) 145 Cal.App.3d 854, 859 [193 Cal.Rptr. 779], defendant argues the court had discretion to permit questioning before the jury. Even if this is correct, the court also had discretion to follow the "better" practice.

■ Defendant also contends the court had a sua sponte duty to instruct the jury that White had invoked the privilege, that the court had determined outside the jury's presence that White was unable to discuss the Green murder at all, and that the jury may not draw any inferences from these circumstances. When urging that White should be allowed to assert the privilege before the jury, defense counsel stated he had no objection to such an instruction, but neither he nor the district attorney requested it.

The instruction, however, is required only "at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury . . . ." (Evid. Code, § 913, subd. (b).) Any benefit of a cautionary instruction is "debatable" in that it may tend to highlight the fact it was intended to minimize. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 877 [251 Cal.Rptr. 227, 760 P.2d 423]; see also *People* v. *Melton* (1988) 44 Cal.3d 713, 757-758 [244 Cal.Rptr. 867, 750 P2d 741] [no sua sponte duty to instruct the jury to draw no adverse inference from a defendant's failure to testify].)

Defendant relies on authority that when a defendant is visibly shackled or removed from the courtroom, the court must instruct the jury to disregard the fact. (*People* v. *Duran* (1976) 16 Cal.3d 282, 291-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Lewis* (1983) 144 Cal.App.3d 267, 280-281 [192 Cal.Rptr. 257] [finding, however, no such duty under the facts].) However, unlike those cases, White's invocation of the privilege did not obviously prejudice defendant. Indeed, defense counsel himself caused White to assert the privilege in front of the jury. He undoubtedly hoped the jury *would* draw an impermissible inference—that White had something to hide, namely that he, not defendant, was guilty of shooting Green.

Defendant also relies on *United States* v. *Martin* (10th Cir. 1975) 526 F.2d 485, in which such an instruction was in fact given. *Martin*, however, merely holds the instruction was properly given, not that it was required sua sponte. (*Id.* at p. 487.)

Defendant claims that absent the cautionary instruction, the jury might have inferred "that White's failure to provide exculpatory evidence was predicated on his knowledge that appellant was the killer." The logic of the claim escapes us. Counsel's failure to request the instruction even though it had been discussed "indicates that the potential for [prejudice] argued now was not apparent to one on the spot." (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 240 [98 L.Ed.2d 568, 579, 108 S.Ct. 546].) The instruction was required only on request.

### D. *Exclusion of Hearsay Evidence*

■ Defendant contends the court erroneously refused to admit evidence of a hearsay statement by White. Outside the jury's presence, he offered to prove that a little over a month before the hearing, on October 8, 1986, White told a defense investigator that he had shot Green. White knew that defendant had already been found to have committed the crime. Defendant argued that White's admission was a statement against interest

under Evidence Code section 1230.[3] The court disagreed, finding that the statement "lacks trustworthiness because it is not apparent from the evidence that the declarant Mr. White had a sufficient belief that he could be punished for his role in that crime at this late date . . . ."

■ The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Blankenship* (1985) 167 Cal.App.3d 840, 849 [213 Cal.Rptr. 666]; *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 878 [123 Cal.Rptr. 862].) In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. (*Blankenship, supra*, at p. 849; *Chapman, supra*, at p. 879.)

"The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion." (*People* v. *Gordon, supra*, 50 Cal.3d at p. 1251.) A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion. (*Id*. at pp. 1250-1251.)

■ The court did not abuse its discretion. White's alleged statement was made to a defense investigator just before defendant's third trial, some fourteen years after the Green shooting. White knew there had long since been a court adjudication that defendant had perpetrated the shooting. The court could reasonably find White wanted to aid his friend at little risk to himself, and thus the statement was insufficiently trustworthy.

Defendant argues that a court may exclude a statement against penal interest only if there is independent evidence affirmatively showing untrustworthiness. Although some of the cases finding untrustworthiness have contained such independent evidence, none has *required* it. The Federal Rules of Evidence state the opposite, that a statement offered "to exculpate the accused *is not admissible* unless corroborating circumstances clearly indicate the trustworthiness of the statement." (Fed. Rules Evid., rule

---

[3] That section provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

804(b)(3), 28 U.S.C., italics added; see generally Graham, Handbook of Federal Evidence (2d ed. 1986) § 804.3.) This exemplifies the general suspicion with which the law looks upon such declarations. (*People* v. *Chapman, supra*, 50 Cal.App.3d at p. 879, fn. 2.)

Citing *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], defendant argues he was entitled to present evidence of third party culpability. "But *Hall* did not undertake to repeal the Evidence Code. Incompetent hearsay is as inadmissible as it always was." (*People* v. *Huggins* (1986) 182 Cal.App.3d 828, 833 [227 Cal.Rptr. 547].)

Defendant finally argues that even if the statement is inadmissible hearsay, its exclusion violates federal due process. He relies primarily on *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. In *Green*, the defendant attempted at the penalty phase of a capital trial to show that he was not an active participant in the murder of which he was convicted. He offered the testimony of a witness that another person admitted killing the victim. The trial court refused to admit the statement under Georgia law which, unlike California law, had no exception to the hearsay rule for declarations against penal interest. The Supreme Court held that exclusion of the statement violated due process under the "unique circumstances" of the case, finding that "substantial reasons existed to assume its reliability" and, "[p]erhaps most important, the State considered the testimony sufficiently reliable to use it against [the declarant], and to base a sentence of death upon it." (*Id.* at p. 97 [60 L.Ed.2d at p. 741], fn. omitted; see also *People* v. *Gates* (1987) 43 Cal.3d 1168, 1210 [240 Cal.Rptr. 666, 743 P.2d 301].)

*Green* v. *Georgia, supra*, 442 U.S. 95, bears little similarity to this case. The People never used White's statement against White, and there is no reason to assume its reliability. (See also *People* v. *Kaurish* (1990) 52 Cal.3d 648, 704-705 [276 Cal.Rptr. 788, 802 P.2d 278] [defendant's hearsay statements not admissible under *Green*]; *People* v. *Harris* (1984) 36 Cal.3d 36, 70 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn.) [suggesting that inadmissible hearsay offered by the defense at the penalty phase must be admitted if it is "highly relevant and substantial reasons exist to assume its reliability"]; Fed. Rules Evid., rule 804(b)(3), 28 U.S.C.) The court did not abuse its discretion in excluding the proffered hearsay.

E. *Claims of Ineffective Assistance of Counsel*

Defendant contends his attorney was ineffective at the penalty phase for failing to object to two items of evidence and to alleged misconduct in the district attorney's argument to the jury. All claims relate to the Green murder.

 To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) A mere failure to object to evidence or argument seldom establishes counsel's incompetence. (*People* v. *Ghent, supra*, 43 Cal.3d at p. 772; see also *Frierson I, supra*, 25 Cal.3d at p. 158.)

### 1. Failure to Object to Evidence of Juvenile Court Adjudication

 Without objection, the court admitted evidence that a juvenile court referee had found defendant murdered Green and had committed him to the California Youth Authority. Defendant contends his attorney was incompetent for not objecting. He correctly points out that a juvenile court disposition is not a "prior felony conviction" under section 190.3, factor (c), which requires the penalty phase jury to consider "The presence or absence of any prior felony conviction." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 294-295 [247 Cal.Rptr. 1, 753 P.2d 1052].) In addition, defendant was tried under the *1977* death penalty law, not the current 1978 law. The 1977 law did not include a prior felony conviction as a specific factor to consider. (*People* v. *Easley* (1983) 34 Cal.3d 858, 885 [196 Cal.Rptr. 309, 671 P.2d 813].)

The adjudication, however, was admissible under both the 1977 and 1978 law as evidence of "criminal activity" involving force or violence. (Current and former § 190.3, factor (b); *People* v. *Hayes* (1990) 52 Cal.3d 577, 633 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 195 [276 Cal.Rptr. 679, 802 P.2d 169].) In addition, aggravating evidence under the 1977 law, unlike the 1978 law, was "not limited to matters relevant to the specified aggravating or mitigating factors." (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446] [*Murtishaw I*].) Rather, the law permitted "the trier of fact to consider evidence as to 'any matter' relevant to mitigation or aggravation . . . ." (*Frierson I, supra*, 25 Cal.3d at p. 177; see also *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1026 [258 Cal.Rptr. 821, 773 P.2d 172] [*Murtishaw II*]; *People* v. *Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782] [contrasting the 1978 law].) Evidence that, as a juvenile, defendant had been committed to the California Youth Authority was relevant to aggravation. It showed that, despite the efforts of the juvenile court system, defendant had not been rehabilitated. (See *People* v. *Turner* (1990) 50 Cal.3d 668, 717, fn. 31 [268 Cal.Rptr. 706, 789 P.2d 887].) Counsel was not incompetent for failing to object.

### 2. *Failure to Object to Admission of Photographs*

 Defendant contends counsel should have objected to the admission of three photographs of Green's body as it appeared when Detective Miller, the investigating officer, observed it. We rejected the contention in *Frierson I.* (25 Cal.3d at pp. 158, 171.)

Defendant now argues that the photographs "gave an inaccurate and highly prejudicial picture of the manner in which the victim was wounded" because they show blood flowing from the mouth whereas the cause of death was a bullet wound in the chest. These facts are not, however, inconsistent. Detective Miller identified the photographs, and testified that Green had "a large amount of blood on his face and emitting from his mouth." The photographs corroborate this testimony, and helped the jury understand and evaluate the testimony that after the shooting, defendant imitated the noise the victim made in trying to breathe after he was shot. Blood flowing from the mouth could explain the noise. Counsel was not ineffective on this point.

### 3. *Failure to Object to Alleged Misconduct*

Defendant contends counsel was incompetent for failing to object to alleged misconduct in the prosecution penalty phase jury argument.

 He claims first that counsel should have objected to argument that "Mr. White can't be prosecuted for this offense." He points out that there is no statute of limitations for murder. The comment, however, was part of a larger argument that the evidence indicated defendant had committed the crime, that a court had so found, and that therefore, as a practical matter, White could not be prosecuted. The argument did not purport to analyze the applicable statute of limitations. It came within the broad range of permissible comment on the evidence. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 967 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892].)

Defendant next complains that the prosecutor improperly expressed his personal belief in defendant's guilt of the Green murder when he argued that the "district attorney is not going to prosecute anybody else for murder who they know didn't commit the murder." A prosecutor may not express a personal opinion as to guilt "if there is substantial danger that a juror will interpret it as being based on information not in evidence." (*People* v. *Heishman* (1988) 45 Cal.3d 147, 195 [246 Cal.Rptr. 673, 753 P.2d 629]; see also *People* v. *Bain* (1971) 5 Cal.3d 839, 847-848 [97 Cal.Rptr. 684, 489 P.2d 564].) The jury had before it all the evidence. There was

no danger it would believe the prosecutor was basing his argument on information not in evidence. The argument was proper.

Finally, defendant complains about the district attorney's discussion of the juvenile adjudication. The complaint is partly based on the erroneous belief the adjudication was inadmissible. In addition, defendant claims the prosecutor should have informed the jury of the differences between juvenile and adult court proceedings. However, the jury knew that a juvenile court referee, not a jury, had found defendant murdered Green. Defense counsel argued to the jury that this made the finding less reliable. This is the only difference between juvenile and adult court that could have aided defendant. Information that the reasonable doubt standard applies in juvenile court and that, except for the right to a jury trial, a juvenile generally has the same rights as an adult (such as the right to counsel, to confront witnesses, and to present a defense), and that the same rules of evidence apply (see, e.g., Welf. & Inst. Code, §§ 679, 701, 702.5), would not have aided the defense. There was no misconduct.

In addition, even if there had been misconduct, counsel could reasonably have chosen not to object. ▮▮▮ As we have noted before in this case, in the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal. (*Frierson I, supra*, 25 Cal.3d at p. 158.) ▮▮▮ Here, defense counsel did not object; rather, he countered the prosecution argument with argument of his own. He stressed, for example, that only a referee of unknown qualifications who did not hear the defense evidence of this case made the juvenile court determination. We will not second-guess such tactics. (*People* v. *Bonillas* (1989) 48 Cal.3d 757, 794 [257 Cal.Rptr. 895, 771 P.2d 844]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 784 [254 Cal.Rptr. 257, 765 P.2d 419].)

F. *Instructional Issues*

1. *Instruction Under 1978 Law*

▮▮▮ Defendant contends the court erroneously instructed the jury under the 1978 death penalty law instead of the 1977 law in effect at the time of the instant crimes. We agree this was error (*Murtishaw II, supra*, 48 Cal.3d at p. 1025), but find it harmless.

Except for one point discussed below, *Murtishaw II, supra*, 48 Cal.3d at pages 1025-1031, is dispositive. There, we held that the relevant 1978 law is more favorable to the defendant than the 1977 law. Indeed, the instructions of this case postdate our decision in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], and thus avoid the possibility of "some

confusion" that existed in the original standard jury instructions under the 1978 law. (See *Murtishaw II, supra,* 48 Cal.3d at p. 1028.)

In one respect, the 1978 law was less favorable to defendant than the 1977 law. Only the 1978 law includes as a specifically listed aggravating factor "The presence or absence of any prior felony conviction." (§ 190.3, factor (c).) Instruction on this factor was thus error. (*People* v. *Easley, supra,* 34 Cal.3d at pp. 884-885.) We recognized this in *Murtishaw II,* but no felony conviction was presented in that case. (48 Cal.3d at p. 1029, fn. 14.) Technically, no felony conviction was presented in this case either. (See *People* v. *Lucky, supra,* 45 Cal.3d at p. 295.) Arguably, however, the jury was led to believe the juvenile murder adjudication was a felony conviction under the instructions. The court never informed the jury it was not, and the distinction would not be obvious to a juror.

To the extent there was error, however, it was harmless. As discussed above, *evidence* of the adjudication was admissible, as was evidence of the underlying prior murder. The jury was allowed to consider any relevant aggravating circumstances, including the juvenile proceedings. In light of this, error in allowing the jury to believe the adjudication was one of the specifically enumerated factors was insignificant. There is no reasonable possibility the error affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Defendant also suggests the court should have instructed the jury on the differences between juvenile court and adult court proceedings. No such instructions were requested and, for the reasons stated, *ante,* at part II. E. 3., none were needed.

2. *Other Issues*

Defendant reiterates various contentions we have previously rejected: (1) that the jury may impose the death penalty only if it makes certain findings beyond a reasonable doubt (*People* v. *Gordon, supra,* 50 Cal.3d at pp. 1273-1274); (2) that the jury may not consider an aggravating factor unless it *unanimously* found the factor had been proved beyond a reasonable doubt (*id.* at p. 1273; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 773-774); (3) that the court erroneously instructed on aggravating and mitigating circumstances (*People* v. *Benson* (1990) 52 Cal.3d 754, 801-803 [276 Cal.Rptr. 827, 802 P.2d 330]); and (4) that the court erroneously failed to delete "extreme" from "extreme mental or emotional disturbance" (*id.* at pp. 803-804). We adhere to our previous decisions.

G. *Accumulated Error*

Defendant contends the cumulative effect of the alleged errors requires reversal of the penalty verdict. We have identified only one instructional error, and have found it harmless. There was no other error to accumulate.

H. *Automatic Motion to Modify Death Verdict*

■■■ Defendant contends the court erred in denying his automatic motion to modify the verdict of death. Former section 190.4, subdivision (e), required the court to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and . . . make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts."

The current section 190.4, subdivision (e), has slightly different language, but we have interpreted it to have the same meaning as the former language. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 793-794 [230 Cal.Rptr. 667, 726 P.2d 113].) The trial court must independently reweigh the evidence of aggravating and mitigating circumstances and then determine whether, in the court's independent judgment, the weight of the evidence supports the jury verdict. It must set forth its reasons with sufficient particularity to allow effective appellate review. (*People* v. *Kelly, supra*, 51 Cal.3d at p. 970.) As in *Kelly*, the record here reveals that the trial court was aware of and executed its responsibilities with particular care and attention to detail. Nonetheless, defendant quarrels with the court's ruling in several respects.

Defendant argues the court did not expressly find he committed the prior murder beyond a reasonable doubt. Although the court's original comments were ambiguous as to whether it merely found the juvenile adjudication was proven beyond a reasonable doubt rather than the crime itself, the court later clarified that it found both proved beyond a reasonable doubt. We therefore need not decide whether the required statement of reasons includes an express finding that the defendant committed other crimes beyond a reasonable doubt.

Defendant correctly argues the court erroneously considered the juvenile adjudication to be a prior felony conviction. However, for the reasons discussed, *ante*, at part II. F. 1., in considering the similar instructional issue, the error was harmless. The court placed primary emphasis on the "calculated and methodical manner" in which defendant carried out his crimes. There is no reasonable possibility the error with respect to this one penalty

factor affected the court's ruling. (*People* v. *Benson, supra*, 52 Cal.3d at p. 812.)

Defendant also contends the court failed to consider or give sufficient weight to the mitigating evidence of his "impaired capacity," his "age," the "testimony of family members," and other "character evidence." The court discussed this evidence, but found it unpersuasive relative to the aggravating evidence. Defendant understandably has a different view of his case in mitigation than the court, but he has shown no error. Although mitigating evidence must be admitted and considered, we have never required the sentencer to give any particular weight to such evidence. Even if the court did not specifically mention each item of mitigating evidence, "there is no indication in the record that the court ignored or overlooked such evidence." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854].) We find no prejudicial error in denying the modification motion.

I. *Constitutionality of the 1977 Death Penalty Law*

 Finally, defendant contends the 1977 death penalty law is unconstitutional. We have rejected the contention in this and subsequent cases (*Frierson I, supra*, 25 Cal.3d at pp. 172-188 (plur. opn.), 188-196 (conc. opn. of Mosk, J.); *People* v. *Hovey* (1988) 44 Cal.3d 543, 586 [244 Cal.Rptr. 121, 749 P.2d 776]), and continue to do so.

### III. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Kennard, J., and Baxter, J., concurred.

Appellant's petition for a rehearing was denied June 26, 1991.